[Cite as *State v. Harper*, 2014-Ohio-347.]

| STATE OF OHIO | ) | IN THE COURT OF APPEALS |
|---|---|---|
| | )ss: | NINTH JUDICIAL DISTRICT |
| COUNTY OF MEDINA | ) | |

| STATE OF OHIO | C.A. No.  12CA0076-M |
|---|---|
| Appellee | |
| v. | APPEAL FROM JUDGMENT ENTERED IN THE |
| ISHA S. HARPER | COURT OF COMMON PLEAS COUNTY OF MEDINA, OHIO |
| Appellant | CASE No.  11CR0602 |

DECISION AND JOURNAL ENTRY

Dated: February 3, 2014

---

{¶1}  Defendant-Appellant, Isha S. Harper, appeals from the August 10, 2012 judgment entry of the Medina County Court of Common Pleas.  We reverse and remand.

I.

{¶2}  On October 19, 2011, at approximately 8 p.m., Trooper Christopher Ausse of the Ohio State Highway Patrol stopped Ms. Harper on northbound I-71 for allegedly following a tractor trailer too closely in violation of R.C. 4511.34.  After initiating the stop, Trooper Ausse learned that Ms. Harper had an outstanding warrant in Ashland County for driving with a suspended license.  Ms. Harper also claimed that she had an outstanding warrant in East Cleveland and advised Trooper Ausse that she was driving there in order to take care of the warrant, pay court costs, and reinstate her driver's license.  At the time of the stop, Ms. Harper was driving a black Chrysler Sebring owned by her cousin, Katricia Hampton.

{¶3}  Trooper Ausse placed Ms. Harper under arrest for the outstanding Ashland County warrant.  He then requested assistance from Sergeants Brock and Helton, and arranged

for a tow truck to transport Ms. Hampton's vehicle to an impound lot. Prior to the tow truck arriving, the officers discovered two kilos of cocaine in the trunk while "inventorying" the vehicle.

{¶4} The Medina County Grand Jury indicted Ms. Harper on one count of possession of drugs in violation R.C. 2925.11(A)(C)(4)(f), and specified her as a Major Drug Offender pursuant to R.C. 2941.1410(A).

{¶5} Ms. Harper pleaded not guilty and moved to suppress the evidence obtained from the search of her car. In her motion, Ms. Harper argued that the discovery of the cocaine resulted from both an illegal stop and search of the vehicle. In denying Ms. Harper's motion, the trial court found:

> On October 19, 2011, at approximately 8:00 p.m. Ohio State Highway Patrol Trooper Ausse was on duty patrolling IS 71. * * * At that time he saw a black vehicle in the north bound lane. As he watched the vehicle he saw it [move from] the right lane to the center lane *just in front of another vehicle. When the vehicle went [past] his cruiser Trooper Ausse noticed that the vehicle was following too close[ly] to a semi-tractor trailer rig right in front of it.* Trooper Ausse pulled out and began to follow the vehicle. At approximately milepost 209 he pulled the vehicle over.
>
> * * *
>
> Trooper Ausse had a reasonable and articulable suspicion that Ms. Harper was violating the traffic laws of Ohio because he observed her traveling too close[ly] [to] the tractor-trailer rig in front of her. Once he stopped the vehicle and found out that she had a warrant, he had the right to both detain her and arrest her on the warrant out of Ashland County. Since his department has a written inventory search policy * * * and since he followed that policy in searching her vehicle after he arrested her, the evidence obtained during that search is not subject to suppression. * * *

(Emphasis added.)

{¶6} A jury found Ms. Harper guilty of possession, with a major drug offender specification, and the trial court sentenced her to a mandatory prison term of thirteen years.

**{¶7}** Ms. Harper timely appealed, and raises six assignments of error for our consideration. To better facilitate our discussion, we will address certain assignments of error together.

II.

## ASSIGNMENT OF ERROR I

THE TRIAL COURT'S FINDING THAT TROOPER AUSSE HAD REASONABLE ARTICULABLE SUSPICION TO STOP THE MOTOR VEHICLE IN WHICH [MS. HARPER] WAS DRIVING WAS NOT SUPPORTED BY SUFFICIENT EVIDENCE AND WAS OTHERWISE CLEARLY ERRONEOUS; THE STOP OF THE VEHICLE AND ALL EVIDENCE FLOWING THEREFROM WERE OBTAINED IN VIOLATION OF THE FOURTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION, AND ARTICLE I, SECTION 14 OF THE OHIO CONSTITUTION.

## ASSIGNMENT OF ERROR II

BASED UPON ALL THE CIRCUMSTANCES, THE TRIAL COURT ERRED IN DENYING THE MOTION TO SUPPRESS EVIDENCE IN THAT THE POLICE DID NOT CONDUCT A VALID INVENTORY SEARCH IN ACCORDANCE WITH STANDARD POLICE PROCEDURES, BUT INSTEAD USED THE PROCEDURE AS A PRETEXT OR A SUBTERFUGE FOR AN INVESTIGATORY SEARCH IN VIOLATION OF THE FOURTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION, AND ARICLE I, SECTION 14 OF THE OHIO CONSTITUTION.

**{¶8}** In her first assignment of error, Ms. Harper argues that the trial court erred in finding that Trooper Ausse was justified in stopping the vehicle because the trial court's findings were clearly erroneous and not supported by competent evidence. Further, in her second assignment of error, Ms. Harper argues that the trial court erred in ruling that the police performed a valid inventory search of the vehicle.

Appellate review of a motion to suppress presents a mixed question of law and fact. When considering a motion to suppress, the trial court assumes the role of trier of fact and is therefore in the best position to resolve factual questions and evaluate the credibility of witnesses. Consequently, an appellate court must

accept the trial court's findings of fact if they are supported by competent, credible evidence. Accepting these facts as true, the appellate court must then independently determine, without deference to the conclusion of the trial court, whether the facts satisfy the applicable legal standard.

(Internal citations omitted.) *State v. Burnside*, 100 Ohio St.3d 152, 2003-Ohio-5372, ¶ 8. *Accord State v. Hobbs*, 133 Ohio St.3d 43, 2012-Ohio-3886, ¶ 6 (*Burnside* applied).

{¶9} The Fourth Amendment to the United States Constitution and Section 14, Article 1 of the Ohio Constitution proscribe unreasonable searches and seizures. A law enforcement official may conduct a traffic stop when there is a reasonable suspicion of criminal activity, such as a traffic violation. *Terry v. Ohio*, 392 U.S. 1, 21-22 (1968); *State v. Campbell*, 9th Dist. Medina No. 05CA0032-M, 2005-Ohio-4361, ¶ 11. A traffic stop constitutes a seizure within the meaning of the Fourth Amendment. *Whren v. United States*, 517 U.S. 806, 809-810 (1996). However, an investigative stop of a motorist does not violate the Fourth Amendment if the officer has a reasonable suspicion that the individual is engaged in criminal activity. *Maumee v. Weisner*, 87 Ohio St.3d 295, 299 (1999) citing *Terry* at 22. "To justify a particular intrusion, the officer must demonstrate 'specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion.'" *Weisner* at 299, quoting *Terry* at 21. Evaluating these facts and inferences requires the court to consider the totality of the surrounding circumstances. *State v. Freeman*, 64 Ohio St.2d 291 (1980), paragraph one of the syllabus. Therefore, "if the specific and articulable facts available to an officer indicate that a driver may be committing a criminal act, which includes the violation of a traffic law, the officer is justified in making an investigative stop." *State v. Hoder,* 9th Dist. Wayne No. 03CA0042, 2004-Ohio-3083, ¶ 8, quoting *State v. Shook*, 9th Dist. Lorain No. 93CA005716, 1994 WL 263194, *2 (June 15, 1994).

**{¶10}** Further, "a search conducted without a warrant issued upon probable cause is 'per se unreasonable * * * subject only to a few specifically established and well-delineated exceptions.'" *Schneckloth v. Bustamonte*, 412 U.S. 218, 219 (1973), quoting *Katz v. United States*, 389 U.S. 347, 357 (1967).

> [A] routine inventory search of a lawfully impounded automobile is not unreasonable within the meaning of the Fourth Amendment when performed pursuant to standard police practice, and when the evidence does not demonstrate that the procedure involved is merely a pretext for an evidentiary search of the impounded automobile.

*State v. Robinson*, 58 Ohio St.2d 478, 480 (1979). "To determine if an inventory search is valid, the court must first determine whether the police lawfully impounded the vehicle. A vehicle can be lawfully impounded when the occupant of the vehicle is arrested." *State v. Robinson*, 9th Dist. Summit No. 19905, 2000 WL 1587007, *3 (Oct. 25, 2000). This Court has rejected a challenge to an impoundment when there was no evidence of a pretextual motive and the impoundment was conducted pursuant to a standard police procedure. *State v. Wilson*, 9th Dist. Medina No. 2624-M, 1997 WL 416408, *2 (June 23, 1997). *Accord State v. McCants*, 9th Dist. Lorain No. 95CA006085, 1995 WL 760388, *1 (Dec. 27, 1995) ("As neither occupant could lawfully drive the car, it was proper for the police to impound the car.").

**{¶11}** If a vehicle has been lawfully impounded, the validity of the inventory search then must be examined. "The justification for inventory searches stems from three administrative caretaking functions: (1) protecting an individual's property while it is in police custody; (2) protecting the police from claims of lost, stolen, or vandalized property; and (3) protecting the police from danger." *Robinson*, 2000 WL 1587007, at *2. "[I]nventories pursuant to standard police procedures are reasonable." *South Dakota v. Opperman*, 428 U.S. 364, 372 (1976).

The Stop

{¶12}  At the suppression hearing, Trooper Ausse testified as follows with regard to the stop:

* * *

While I was watching northbound traffic, I was able to observe a black smaller vehicle traveling northbound in the far right lane.

As I pulled out, the vehicle continued almost as if they had their cruise control on with a slow progression towards the rear end of a semi[-]truck.

At that point due to the close nature, the driver continued to tap on her brakes. There was a light to moderate traffic pattern.  There was traffic in every lane but not so much like if it was 5 o'clock in the afternoon but there was traffic around.

As soon as the vehicle was able to, it went from the far right-hand lane and then went in to the center lane *just in front of another vehicle*.

* * *

(Emphasis added.)  Trooper Ausse further explained that in order to have a good reactionary gap between vehicles "you want to keep at least one car length for every 10 miles an hour."  He estimated that at the time Ms. Harper passed by his cruiser, her vehicle was approximately five or six car lengths behind the semi-truck.  At that time, Trooper Ausse pulled out from the median and followed Ms. Harper.  As he approached her vehicle, Trooper Ausse observed that Ms. Harper was tapping her brakes, and that she "was no more than probably two and a half car lengths" behind the semi-truck.  He then testified that Ms. Harper made a quick lane change from the far right lane to the center lane, and, in doing so, cut off an SUV in the center lane.  Trooper Ausse stated that "[a]t that point, [he] activated [his] overhead lights, progressed over to behind the vehicle there, gave an audible signal and issued a traffic stop for that vehicle."

{¶13}  First, although Trooper Ausse testified that Ms. Harper was driving in a 65 mile per hour zone, he never testified as to her *actual* speed, or even her estimated speed, at the time of the alleged violation.  As such, Ms. Harper's speed could have been greater or lesser than the

posted speed limit of 65 miles per hour, which would directly affect the number of car lengths recommended for maintaining a safe distance between moving vehicles. Based upon Trooper Ausse's testimony, we know that Ms. Harper applied her brakes prior to being stopped, but we have no idea what her actual speed was at any point during the trooper's observations. Further, Trooper Ausse's recommended formula of maintaining "at least one car length for every 10 miles per hour," indicates that Ms. Harper's speed would be a key factor in determining whether the trooper had reasonable, articulable suspicion in stopping her vehicle for an alleged violation of R.C. 4511.34. In the absence of this critical piece of evidence, it is difficult for the trial court, or this Court on review, to fairly determine whether Trooper Ausse had a reasonable suspicion that the violation of following too closely occurred.

{¶14} Second, upon careful review of the dash-cam video, which was submitted as evidence during the suppression hearing, it is clear that Ms. Harper did not pull out in front of *any* vehicles when changing lanes from far-right to center. In fact, other than the trooper's police cruiser, there were no other vehicles visible in the center lane of traffic. However, although the dash-cam video evidence directly contradicts Trooper Ausse's testimony that Ms. Harper failed to yield to oncoming traffic while changing lanes, the trial court incorrectly found that Trooper Ausse "saw [Ms. Harper's vehicle] [] [move from] the right lane to the center lane *just in front of another vehicle*." (Emphasis added.) Additionally, the trial court found that Trooper Ausse witnessed this lane change violation while remaining stationary in the median, when the dash-cam video reveals that the trooper had initiated his pursuit and was already following Ms. Harper when she changed lanes.

{¶15} We acknowledge that, in the past, this Court has affirmed/reversed a trial court's suppression rulings based solely upon an officer's testimony regarding an observed traffic

violation. *See State v. Campbell*, 9th Dist. Medina No. 05CA0032-M, 2005-Ohio-4361, ¶ 12. However, in the present matter, the State offered video evidence that directly refutes Trooper Ausse's testimony. As such, we cannot reconcile the trial court's decision, relying solely upon Trooper Ausse's testimony, with the contradictory physical evidence of the stop.

{¶16} Based upon the lack of evidence in the record regarding Ms. Harper's speed, and the fact that the physical evidence directly contradicts Trooper Ausse's testimony, we cannot say that the trial court's findings of fact with regard to the validity of the stop were supported by competent, credible evidence. As such, we conclude that Trooper Ausse did not have a reasonable, articulable suspicion to stop Ms. Harper's vehicle.

The Inventory

{¶17} According to The Ohio State Highway Patrol's administrative inventory policy:

On the occasion of abandonment, traffic crashes, criminal investigations and certain arrest actions, it is necessary for our officers to remove motor vehicles or other property from the scene to a location of greater security. Prior to releasing the motor vehicle or other property from Division control, an inventory must be completed. An administrative inventory is necessary:

[1] To protect personal property[;]

[2] To protect the public caretaker (e.g., towing or storage company)[;]

[3] To protect the officer and the Division.

* * *

Once an inventory has been initiated, the officer *must complete the inventory and should not stop after finding contraband or other incriminating materials.*

(Emphasis added.)

{¶18} On direct examination, Trooper Ausse explained the purpose of the HP-25D form as follows:

* * *

What we have is a form that's called the [HP-]25D, and basically it's a – I like to call it and I explain to people it's a glorified receipt and what happens is it puts down their information, the contents of the vehicle, who inventoried it, who was the arresting officer and what tow company has the vehicle.

* * *

Further, Trooper Ausse testified as to the scope of the inventory:

Q.  Does that inventory, this vehicle inventory and custody report which you referred to as an HP-25D, does that also contain information about the contents of the motor vehicle?

A.  Yes, about halfway down.  After the driver, the owner, there is a place to conduct the inventory of the vehicle.

Q.  Okay.  * * * What do you do when you inventory the vehicle?

A.  Basically, we're taking an account of all of the contents that was in the vehicle and that's to make sure that * * * everything that's in there for when we release it to the wrecker company was [the same as] [] everything that was in it when we stopped the vehicle so somebody doesn't come back and say hey, I had a million dollars in the trunk and it's not in there now or an iPhone.  *It could be as little as a pack of cigarettes.*  Everything we put on there to make sure there is a record.

THE COURT:  Do you leave – assuming the contents aren't contraband, do you leave them in the vehicle?

[A.]  As long as it's not contraband of any nature, we leave it in the vehicle.  Sometimes the people who are being arrested or are taken will ask for a wallet, a cell phone.

I will give that back to them so they have a way to communicate with their family and friends and then we will mark it as such that we've already put it on the inventory.

* * *

Q.  Okay.  And do you conduct this investigation or this inventory pursuant to just training or is there a written policy of the highway patrol?

A.  There is a written policy and then we're also trained as well, the things that we need to do.

* * *

Q.  All right.  And have you had an opportunity through your training to review that inventory policy of the highway patrol?

A. Yes.

Q. And do you conduct your searches in compliance with that policy?

A. Yes, I do.

\* \* \*

{¶19}  However, in juxtaposition to his previous testimony, Trooper Ausse admitted that certain items were not included on the HP-25D form for Ms. Harper:

Q. You talked about a black duffel bag, do you remember that, sir?

A. Yes, sir.

Q. You put it in your report, right?

A. Yes, sir.

Q. You noticed it before you even talked to Ms. Harper, right?

A. As I approached and asked her for her information, correct.

Q. And you have an HP-25D form, an inventory form, do you not—

A. Correct.

Q. –somewhere amongst the documents?

A. Correct.

Q. Okay. Can you tell me where it indicates this black duffel bag?

A.  It doesn't say anything on the report.

Q. Do you know what was in this black duffel bag?

A.  She said it was her overnight miscellaneous clothes, toiletries, things of that nature.

Q. Okay.  Is that documented in your report so that one by reading just the repot know everything that's relevant to the case?

A. In the case or in the [HP-]25[D form]?

Q. Anywhere on any of the documents you have before you, sir?

A.  The black duffel bag is only referenced here to observation.  As far as later on, I didn't put it on [the HP-25D Form] [] *because it wasn't pertinent to the case so as I progressed through the case, it had no contraband, it had nothing illegal so I don't put inventory on my case statement.* * * *

THE COURT:  Why wasn't that put on the inventory list?

[A.]  I would have to talk to Sergeant Brock about that.  Like I said, once I went to the trunk of the vehicle, he was the one writing the information down.

* * *

{¶20}  In addition, Trooper Ausse disclosed that, approximately one-half hour prior to spotting Ms. Harper's vehicle, he received a tip to look for a "vehicle of interest" described as "[a] black small four-door car traveling northbound."  Trooper Ausse claimed that he did not know where this information originated, but that it was transferred from Sergeant Brock to himself, and that Officer Gump already "spotted it" on northbound 71.  The following questioning ensued:

Q.  With all due respect. Trooper Ausse, you left out a fairly major potential fact in your effort to make this complete statement that stands on its own about this situation; did you not?

A.  What would that be?

Q.  The revelation you've explained about being on the lookout for a black small car coming northbound, right?

A.  Correct.

Q.  That's not in your report?

A.  No.

* * *

Q.  Okay.  Are you familiar with Lieutenant Bill Haymaker?

A.  Yes.

Q.  Who is he, sir?

A.  He is my post commander.

Q. So he's the supervisor over you, sir?

A. Yes.

Q. Does he carry on any kind of meetings prior to you going out on the road? Is he that kind of a supervisor or is he above?

A. No. He's the post commander. * * *

Q. Okay. However, he has some intelligence. He would be one person that might actually disseminate and put that out there to officers at the post?

A. Yes.

Q. And you certainly were briefed prior to going out on the road that night prior to making the stop of Ms. Harper on the fact that, quote, "Isha Harper, 31 might be passing through Medina County and involved in drug-related activity," end quote.

A. It was a short time before the traffic stop, yes, not at the shift at 2 o'clock.

* * *

Q. Okay. And actually anyone who got discovery for the defense of Ms. Harper wouldn't even know anything about this tip that you did know something about and that you were looking out for this black vehicle that night?

A. A short time prior to the traffic stop, yes, there was a tip. It was coming – I don't know what agency. I'm sure you could find out. It was being passed from one person to another person and then to me to be on the lookout for a small black vehicle. That is what I was given.

* * *

{¶21} In *State v. Woods*, 8th Dist. Cuyahoga No. 98054, 2012-Ohio-5509, the Eighth District Court of Appeals addressed a situation that is factually similar to the matter presently before this Court. Two Cleveland patrol officers stopped Mr. Woods for an alleged speeding violation after pacing his Lincoln for a little over two blocks in a 25 mile per hour zone. *Id*. at ¶ 2. The officers asked Mr. Woods to step out of the car and found marijuana in his pant leg. *Id*. at ¶ 4. After arresting Mr. Woods, the officers proceeded to inventory his car in preparation for

having it towed. *Id.* at ¶ 6. In doing so, they found a backpack in the trunk with "two large bags of marijuana" inside. *Id.*

{¶22} Mr. Woods filed a motion to suppress alleging that the stop, pat down, arrest, and inventory were improper. *Id.* at ¶ 11. The trial court granted his motion holding that the officers lacked probable cause to stop his vehicle for traveling 35 miles per hour in a 25 mile per hour zone where (1) radar was not used, and (2) neither officer testified that he had been trained "in detecting speed of another vehicle unaided by technology." *Id.* at ¶ 12. Further, the trial court held that the inventory was improper. *Id.*

{¶23} The Eighth District Court of Appeals affirmed the trial court's decision, stating:

> The testimony of the officers that the search was an inventory search of the vehicle was tantamount to a tow is disingenuous and merely a pretext for the claimed inventory, and the search of the trunk and most suspiciously, the hood, along with the officer's failure to list all of the vehicle's contents on the inventory list suggests that the search of the vehicle was neither incidental to a tow nor for the purposes of inventory. This is a classic example of a police officer's intentional use of an unlawful traffic stop, under a questionable codified ordinance, for the sole purpose of conducting a fishing expedition for evidence of another crime, and a tailored script at the motion to suppress hearing to justify and stop and subsequent searches.

(Internal quotations and citations omitted.) *Id.* at ¶ 25.

{¶24} In the present matter, Trooper Ausse testified that the purpose of an inventory was to take an accounting of *everything* in the vehicle, including something as insignificant as a pack of cigarettes, in order to create a record for the protection of all parties. However, in spite of this testimony, he testified that he did not include Ms. Harper's black duffel bag or any its contents on the HP-25D Form because it was not pertinent to the case and did not contain any contraband. Further, it appears from the record that, once the cocaine was discovered, the officers did not bother looking inside the black duffel bag and simply took Ms. Harper's word that it contained clothing and toiletries. Trooper Ausse's testimony regarding the handling of the black duffel bag

is wholly inconsistent with the Ohio State Highway Patrol's administrative inventory policy which explicitly states that "[o]nce an inventory has been initiated, the officer must complete the inventory and should not stop after finding contraband or other incriminating materials." Additionally, shortly before the stop, Trooper Ausse received a tip to be on the lookout for a "black small four-door car traveling northbound," and that "Isha Harper, 31 might be passing through Medina County and involved in drug-related activity."

{¶25} For the reasons stated above, we adopt the Eighth District's reasoning in *Woods* and, in doing so, conclude that (1) Trooper Ausse lacked reasonable, articulable suspicion to stop Ms. Harper's vehicle for following too closely in violation of R.C. 4511.34, (2) the officers failed to conduct a proper inventory of Ms. Harper's vehicle pursuant to standard operating procedures of the Ohio State Highway Patrol, and (3) the inventory of the vehicle prior to towing was disingenuous and pretext for a warrantless search. Therefore, the stop, search, and seizure of Ms. Harper's vehicle were unreasonable under the Fourth and Fourteenth Amendments to the United States Constitution Section 14, Article 1 of the Ohio Constitution. *See Opperman*, 428 U.S. at 372.

{¶26} Accordingly, Ms. Harper's first and second assignments of error are sustained.

### ASSIGNMENT OF ERROR III

THE TRIAL COURT ERRED IN CONDUCTING A VERY PARTIAL CROSS-EXAMINATION OF [MS. HARPER] WHICH VIOLATED [HER] RIGHTS TO A FAIR TRIAL, DUE PROCESS, AND THE RIGHT TO AN IMPARTIAL JUDGE UNDER THE SIXTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION; THE TRIAL COURT ALSO ABUSED ITS DISCRETION UNDER EVIDENCE RULE 614(B).

### ASSIGNMENT OF ERROR IV

THE PROSECUTION ENGAGED IN PREJUDICIAL MISCONDUCT BY DENIGRATING AND IMPUGNING THE INTEGRITY OF DEFENSE COUNSEL AND MAKING OTHER PREJUDICIAL COMMENTS IN

CLOSING ARGUMENT IN VIOLATION OF [MS. HARPER'S] RIGHTS TO A FAIR TRIAL AND DUE PROCESS UNDER THE SIXTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION.

## ASSIGNMENT OF ERROR V

THE TRIAL COURT ERRED IN PERMITTING THE STATE TO INTRODUCE EVIDENCE OF THE ALLEGED STREET VALUE OF THE COCAINE FOUND IN THE TRUNK OF THE VEHICLE, THE AMOUNT OF BAIL [MS. HARPER] POSTED AFTER HER ARREST, IN VIOLATION OF [MS. HARPER'S] RIGHT TO A FAIR TRIAL AND DUE PROCESS UNDER THE SIXTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION.

## ASSIGNMENT OF ERROR VI

THE CUMULATIVE EFFECT OF ALL THE ERROS ENUMERATED IN ASSIGNMENTS OF ERROR III THROUGH V DENIED [MS. HARPER] THE RIGHT TO A FAIR TRIAL AND DUE PROCESS UNDER THE SIXTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION.

**{¶27}** Based upon our resolution of Ms. Harper's first and second assignments of error, we conclude that her third, fourth, fifth, and sixth assignments of error are moot. *See* App.R. 12(A)(1)(c).

III.

**{¶28}** In sustaining Ms. Harper's first and second assignments of error, and rendering her third, fourth, fifth and sixth assignments of error moot, the judgment of the Medina County Court of Common Pleas is reversed and this cause remanded for further proceedings consistent with this decision.

Judgment reversed
and cause remanded.

———

There were reasonable grounds for this appeal.

We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Medina, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.

Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(C). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.

Costs taxed to Appellee.

_____
CARLA MOORE
FOR THE COURT

WHITMORE, J.
HENSAL, J.
CONCUR.

APPEARANCES:

PHILIP J. KOREY, Attorney at Law, for Appellant.

DEAN HOLMAN, Prosecuting Attorney, and MATTHEW A. KERN, Assistant Prosecuting Attorney, for Appellee.